IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Criminal Action No. 07-cr-00275-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

3.     RAFAEL RAMIREZ-BIRRUETA,
7.     ANA NEMECIA OROZCO,
8.     BEATRIZ MUÑOZ-CARRILLO,
9.     LUZ ELENA RODRIGUEZ-CARILLO,
11.   JOSE MARTINEZ,
12.   TAD ASA DAVIS,
14.   ADRIAN ALLEN ROMERO,
15.   EVARISTO OROSCO,
16.   MARTHA OROSCO,
21.   JULIANA ATENCIO, and
23.   CYNTHIA OROSCO,

      Defendants.

---

## ORDER

---

THIS MATTER comes before me following the September 25, 2009 and February 16, 2010 hearings on coconspirator statements. I have also considered numerous submissions by the Government on this issue, ultimately culminating in a final "*James Proffer*" filed on June 5, 2009 [d/e 1237]. I have also reviewed pleadings submitted by the Defendants related to coconspirator statements. Having reviewed the Government's evidence and the arguments of counsel, I make the following findings.

## I. LEGAL STANDARD

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the

course and in furtherance of a conspiracy." FED. R. EVID. 801(d)(2)(E). Before admitting purported coconspirator testimony as non-hearsay, a district court must determine that the statements fall within 801(d)(2)(E)'s definition. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In order for statements to be admissible under Rule 801(d)(2)(E), the proponent of the evidence must establish, by a preponderance of the evidence: "(1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; and (3) that the statements were made in the course of and in furtherance of the conspiracy." *United States v. Hall*, 473 F.3d 1295, 1302-03 (10th Cir. 2007) (quotations and citations omitted). To make these factual determinations, the district court may hold a "James" hearing outside the presence of the jury. *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995); *United States v. James*, 590 F.2d 575 (5th Cir.1979) (set forth a pretrial proceeding enabling the district court to determine whether coconspirator statements were admissible at trial under FED. R. EVID. 801(d)(2)(E)). A district court may also provisionally admit the statements on the condition that the prosecution "connect up" the evidence and prove the existence of the predicate conspiracy through trial testimony or other evidence. *Owens*, 70 F.3d at 1123.

Because the admissibility of these statements is a preliminary determination governed by Rule 104(a), "the district court has the discretion to consider any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial." *Owens*, 70 F.3d at 1124. There must be some evidence other than the proffered statements themselves, but the required level of independent evidence is low. *See United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993) (suggesting that

independent evidence does not have to be substantial).

To prove a conspiracy, the government must show (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent. *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005). To prove knowledge of the essential objectives of a conspiracy, the government does not have to show the defendant knew all the details or all the members of a conspiracy. *Id.* "Rather, the government only needs to demonstrate the defendant shared a common purpose or design with his alleged coconspirators." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006).

The Tenth Circuit has recognized that determining the existence of, and membership in, a drug conspiracy is particularly problematic. *See United States v. Ivy*, 83 F.3d 1266, 1285 (10th Cir. 1996). Because "drug conspiracy jurisprudence ... is often very fact specific, and do[es] not always provide clear guidance," the Tenth Circuit has identified certain principles to guide the Court's analysis here. *Id.* It is not enough for the Government to show that a group of people "separately intend to distribute drugs in a single area nor even that their activities occasionally or sporadically place them in contact with each other." *United States v. Evans*, 970 F.2d 663, 670-71 (10th Cir. 1992). "[M]ere association with conspirators known to be involved in crime" is also insufficient. *Ivy*, 83 F.3d at 1285.

In addition, a defendant who "merely purchases drugs or property for personal use from a member of the conspiracy 'does not thereby become a member of the conspiracy.'" *United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991) (quoting *United States v. Fox*,

902 F.2d 1508, 1514 (10th Cir. 1990). "[P]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy[.]" *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987). As the Tenth Circuit explained in *Ivy*, "the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy." 83 F.3d at 1285-86. The Government must show through direct or circumstantial evidence that the Defendants "intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *Evans*, 970 F.2d at 671 (emphasis in original); *accord*, *Ivy*, 83 F.3d at 1285-86.

## II.    PROCEDURAL HISTORY

On October 31, 2008, this case was reassigned to me upon the resignation of Judge Edward W. Nottingham. [d/e 938]. At the first status conference before me on December 19, 2008, Government counsel indicated that the Government was ready to proceed with a *James* hearing, but asked for leave to supplement the Government's previous *James* filing. I ordered the government to re-file its *James* materials and provided the Government with explicit instructions to follow when resubmitting its materials:

> Let me make it clear. My practice is--I want to make sure what you filed is a clear, lucid, and understandable document that tells me who the declarant is. Well, first you can identify the conspiracy. If the conspiracy is clearly defined in the Indictment, you can refer to that. Then I want to know who the declarant is. Then I want to understand what the statement is, and then how that statement is in furtherance of the alleged conspiracy.

See Transcript "Tr." of December 19, 2008 status conference. The Government refiled its *James* materials on February 23, 2009, which I struck following a brief discussion during

the May 7, 2009, hearing on pending motions.  At that time I stated:

> [W]hat you filed is not in compliance with what I ordered, I'm going to strike it, and I'm going to order you to refile it in the right form.... since the cowboys case, back in 2003, I've been using charts for James proffers, it's easier for me to follow, easier for the defendants to follow -- all I'm saying -- because I said a chart back in December, so you need to listen better...because we end up wasting time, you have to redo this.... what you filed is not a useful work product for purposes of me figuring out what you're saying[.]

May 7, 2009 hearing [unofficial Bridge Transcript at 11:49:08-11:51:48].  I then ordered the Government to refile its *James* supplement and to include a chart that "that tells me who the declarant is, what the statement is, and why the government believes the statement is in furtherance of the conspiracy."  *Id.* at 11:46:52-11:47:02.

Although I gave the Government until June 5, 2009 to file an amended *James* Proffer, the Government resubmitted its *James* materials eight days later.   That same day, I issued yet another Order striking the Government's submission for failing to comply with my prior Orders.  I noted that the Government's submission failed yet again for the same reasons cited in my prior rulings.  Specifically, that Order provides,

> This document is still not in compliance, [e]ach chart entry is a summary of an interview with a Defendant, rather than a statement... Thus, it is still not clear exactly what statements the government seeks to admit.  Furthermore, this filing is again a supplement, and not a new comprehensive filing, as I previously, and repeatedly, ordered. Accordingly, I will strike this filing, along with all the government's previous filings, so that the government can refile a single, comprehensive James Proffer.

*See* May 15, 2009 Order (striking Government *James* submissions [d/e 709, 1059, 1095 and 1197].[1]

On June 5, 2009, the Government refiled its *James* Proffer.  *See* Response to

---

[1]In the May 15, 2009 Order I also granted Defendant Jose Martinez's Motion for James Hearing [doc. #308], filed January 17, 2008, and a Motion for Production of Rule 801(d)(2)(E) Materials and for a James Determination of Admissibility of Alleged Co-Conspirator Statements [doc. #329], filed by Defendant Rafael Ramirez-Birrueta on January 18, 2008 and later joined by Defendant Armando Martinez-Anaya.

Motions for *James* Hearing [d/e 1237].  The Government's submission consists of a factual summary of the allegations from the superseding indictment and a 26-page "Chart", which purports to "summariz[e] the statements sought to be admitted" by the Government. Although the Government's June 5, 2009 filing represents an improvement over its previous efforts, the Government's submission was plagued by the same deficiencies as its prior submissions, namely a failure to clearly set forth the statements the Government seeks to admit.  No further supplements were permitted and I held a hearing on the Government's *James* Proffer on September 25, 2009, which carried over to February 16, 2010.  The purpose of the hearing was for the Government to adduce testimony to explain its "Chart", and most importantly, to identify "statements" the Government seeks to introduce.  Tr. of Sept. 25, 2009, p. 14-15.  The Government called only one witness at the hearing, Special Agent Albert Villasuso, and introduced only one exhibit, the Chart submitted on June 5, 2009.

Most of the Defendants who responded to the Government's Proffer argue that because of the deficiency in the filing, none of the statements should be admitted.  I do not agree with Defendants that a wholesale finding of inadmissibility in the form of a sanction against the Government is appropriate here.  Sanctions are unnecessary when the actual consequence of the Government's failure to comply with the my Orders is that the Government simply failed to satisfy its burden to gain admission of coconspirator statements in many instances as set forth below.

I will now address whether the Government has demonstrated any basis to provisionally admit specific coconspirator statements against any of the Defendants presently before the Court.

## III.  LEGAL ANALYSIS

### A.  EXISTENCE OF AND PARTICIPATION IN, A CONSPIRACY

The starting point for the analysis is whether the Government has demonstrated the existence of a conspiracy and whether the declarant and the defendants are members of that conspiracy. *Hall*, 473 F.3d at 1302-03. I will discuss each of the conspiracies identified in the superseding indictment separately.[2]

#### (i.)  COUNT ONE - CONSPIRACY TO IMPORT COCAINE

Count One of the superseding indictment, which was filed December 19, 2007, charges seven Defendants with conspiring to import into the United States from Mexico five or more kilograms of cocaine between April 14, 2000 and December 17, 2007. Count One identifies Samuel Orozco, Juvenal Ramirez-Birrueta, Rafael Ramirez-Birrueta, Ramon Mendoza-Sandoval, Sebastian De Los Santos-Hernandez, Beatriz Adriana Mercado-Macias and Armando Martinez-Anaya as indicted coconspirators. [d/e 249, p. 2-3]. Joseph Torrez and Gregory Montgomery are also named as unindicted coconspirators. The superseding indictment provides no further elaboration on this conspiracy.

The Government's Proffer, Chart, and the testimony of Special Agent Villasuso, however, provide additional detail regarding the conspiracy alleged in Count One. The Government's materials describe a "drug trafficking organization (DTO) which had been operating since April 2000, importing cocaine from Mexico into the United States, with operations primarily in the Atlanta and Denver metropolitan areas." Govt.'s Mot., p. 2 [d/e 1237]. Interviews with Torrez and Montgomery revealed the DTO's importation methods

---

[2]Counsel for the Government indicated at the September 25, 2009 hearing that "Counts One and Two from the government's point of view are inextricably intertwined[.]" *See* Tr. of Sept. 25, 2009, p. 20, lns 15-18. While there may be similarities and some overlap in the evidence, I do not share the Government's view or believe it appropriate to short-cut the analysis in the manner suggested by the Government.

(driving Land Rovers loaded with more than 20 kilograms of cocaine in modified gas tanks across the Mexican border) and hierarchy (Samuel Orozco was "the boss" and Torrez headed up the DTO's transportation group). Torrez personally delivered 6 loads of cocaine from Samuel Orozco's Juarez, Mexico residence to Samuel Orozco's residence at 5910 South Ogden Court, Centennial, Colorado.

The summary of interviews with Juvenal Ramirez-Birrueta indicates that he became involved with the DTO through his sister's husband, Ramon Mendoza-Sandoval. Mendoza-Sandoval, who himself was a driver of cocaine-loaded vehicles from Mexico to Denver, recruited Juvenal Ramirez-Birrueta to also drive cocaine loads across the Mexican border. Juvenal Ramirez-Birrueta agreed to join the DTO and transported approximately 20 kilograms of cocaine on two different trips in 2001 and 2002. Samuel Orozco purchased the Land Rover used in these trips for Juvenal Ramirez-Birrueta and also instructed Mendoza-Sandoval to pay Juvenal Ramirez-Birrueta $15,000 for each trip.

After Mendoza-Sandoval asked Juvenal Ramirez-Birrueta to recruit additional drivers for the DTO, Juvenal Ramirez-Birrueta's brother, Rafael Ramirez-Birrueta, informed Juvenal that he wanted to work as a driver for the DTO. Thereafter, Rafael Ramirez-Birrueta met Samuel Orozco and Juvenal Ramirez-Birrueta at Land Rover East in Aurora, Colorado to complete the paperwork transferring ownership of a white Land Rover from Juvenal to Rafael.

Glorivee Gonzalez's interview reveals her participation in the DTO including managing a stash house in Atlanta, Georgia and serving as a drug and currency load driver between Atlanta and Jaurez, Mexico. Glorivee Gonzalez described an instance when she delivered a Volkswagen Jetta loaded with U.S. currency to Samuel Orozco and Beatriz Adriana Mercado-Macias. During April 2007, Samuel Orozco provided Glorivee Gonzalez

with bulk U.S. currency and instructed her to purchase a Land Rover, which she was told to drive to Houston, Texas. When she arrived in Houston, Glorivee Gonzalez turned the vehicle over to Sebastian De Los Santos Hernandez. When the cocaine loaded vehicle was returned to her, she was instructed to deliver the vehicle to Alejandro de Los Santos Ortiz in Denver, Colorado.

Based on the Government's Proffer, Chart, and the testimony of Special Agent Villasuso, I find that the Government has shown that some type of conspiracy to import cocaine from Mexico existed and that Samuel Orozco, Juvenal Ramirez-Birrueta, Ramon Mendoza-Sandoval, Sebastian de Los Santos-Hernandez, Joseph Torrez and Gregory Montgomery were members of that conspiracy. Most of the evidence against these individuals comes from interviews with eye-witness and participants in the conspiracy and substantiates an organized and substantial drug importation organization.

The problem with the Government's evidence, however, is that it describes a large conspiracy of considerable duration. *Evans*, 970 F.2d at 674 ("The tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse."). The superseding indictment alleges that the conspiracy to import into the United States from Mexico five or more kilograms of cocaine occurred between April 14, 2000 and December 17, 2007. In this case, the Government seized 24 kilograms of cocaine from the DTO on January 19, 2007 and 21 kilograms of cocaine on May 3, 2007. Govt.'s Mot., pp 2-3 [d/e 1237]. The Government's evidence concerning the importation of drugs following the May 3, 2007 arrests raises the question of when the importation conspiracy might have ended. Whether this massive conspiracy ended on May 3, 2007 or, as the Government has alleged, December 17, 2007, is significant. If the conspiracy ended on May 3, 2007, many of the statements the Government seeks to admit would be inadmissible. *United States*

*v. Osorio-Soto*, 139 F.3d 913 (10th cir. 1998) (statements made to conceal criminal conduct after the conspiracy's objectives have either failed or been achieved are not admissible as coconspirator statements.)

It is not necessary for me to resolve that issue here because the Government has failed to show that any of the Defendants presently before the Court were members of the cocaine importation conspiracy. The only Defendant before the Court named in count one is Rafael Ramirez-Birrueta. The Government claimed that Rafael Ramirez-Birrueta "wanted to work as a driver" for the DTO and even met Samuel Orozco, along with Juvenal Ramirez-Birrueta, at a Land Rover dealership in July 2002 to take ownership of a Land Rover. *See* Government's Chart, p. 18, ¶J-K. The Government, however, provides no further information concerning Rafael Ramirez-Birrueta. There is no evidence that he actually agreed to transport cocaine in the Land Rover, or that he even left the dealership driving the Land Rover. The Government's discussion of Rafael Ramirez-Birrueta begins and ends with his desire to be a driver and the transfer of title to a Land Rover to him in July 2002. No other reference is made by the Government to Rafael Ramirez-Birrueta. While his involvement with the Land Rover might support an inference of his involvement in the money laundering conspiracy, the Government has failed to argue, much less show, that Rafael Ramirez-Birrueta "knowingly and voluntarily participated in the conspiracy" to import cocaine from Mexico. *Small*, 423 F.3d at 1182.

As to the remaining Defendants named in Count One, the Government has failed to show that Beatriz Adriana Mercado-Macias and Armando Martinez were members of the importation conspiracy. The Government's submissions barely mention Beatriz Adriana Mercado-Macias, and the only reference to that Defendant details her involvement with Glorivee Gonzalez transporting U.S. currency to Mexico. *See* Govt.'s Chart, p. 9, ¶B-C.

The brief summary attached to the Government's Chart mentions that Beatriz Adriana Mercado-Macias oversaw Samuel Orozco's operations in Mexico, but this conclusory statement is never explained, elaborated or supported by any other information. Govt.'s Mot., p. 3 [d/e 1237]. The testimony at the hearing further failed to illuminate Beatriz Adriana Mercado-Macias' involvement in a cocaine importation conspiracy. *See* Tr. of Sept. 25, 2009, pp 60-61.[3] The Government's failure to provide more information leaves no basis for me to even infer that Beatriz Adriana Mercado-Macias knew about a conspiracy to import cocaine or that she shared a goal with the members of the conspiracy.[4]

The Government also failed to make the requisite showing with respect to Armando Martinez, albeit for different reasons. The conspiracy described in Count One is alleged to have commenced on April 14, 2000. The Government admitted at the hearing that Armando Martinez's participation in the conspiracy ended in May 2000 following his arrest in Texas in a vehicle containing 20 kilograms of cocaine. Tr. of Sept. 25, 2009, pp. 66-67. While it appears Armando Martinez agreed with Samuel Orozco to import cocaine, there is no way for me to discern when that agreement started and stopped in relation to the dates relevant to Count One.

### (ii). COUNT TWO - CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE COCAINE

---

[3]The superseding indictment details her participation in wiring money involved in the DTO. *See* Sup. Indict., p. 56-58, and 76.

[4]I do not mean to suggest that Beatriz Adriana Mercado-Macias's involvement in transporting currency would not support her participation in the conspiracy alleged in Count One. Rather, I find that the Government has failed to provide evidence or argument that Beatriz Adriana Mercado-Macias and the Count One Defendants intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged. *See Evans,* 970 F.2d at 670-71. The Government also failed to show that Beatriz Adriana Mercado-Macias knew the essential objectives of the Count One conspiracy - to import cocaine from Mexico. In any event, the Government has not identified any statements it seeks to introduce where Beatriz Adriana Mercado-Macias was the declarant.

Count Two charges certain Defendants with conspiring to possess with intent to distribute five kilograms or more of cocaine. The alleged dates are the same - April 14, 2000 to December 17, 2007 - and the indicted Defendants are Samuel Orozco, Juvenal Ramirez-Birrueta, Rafael Ramirez-Birrueta, Ramon Mendoza-Sandoval, Clemente De Los Santos-Alvarez, Ana Nemecia Orozco, Beatriz Munoz-Carrillo, Luz Elena Rodriguez-Carrillo, Jesus Dorantes-Feregrino, Jose Martinez, Tad Davis, Shane MacDonald, Adrian Allen Romero, Evaristo Orosco, Martha Orosco, Benerito Abel Marquez, Beatriz Adriana Mercado-Macias, Alejandro De Los Santos-Ortiz and Armando Martinez-Anaya. Joseph Torrez, Gregory Montgomery and Daniel Valdez are named as unindicted coconspirators. The Government acknowledged that

> [s]ome of the named defendants named in Count Two did not physically possess or distribute drugs. However, the Government alleges that these defendants facilitated the DTO by obtaining vehicles, renting "stash" houses, concealing the drugs prior to ultimate distribution, and by laundering the proceeds from the drug trafficking activities, all of which were vital to the ongoing criminal activities.

Govt's Mot., p. 5, ¶6 [d/e 1237]. While I do not disagree with the Government's acknowledgment, this does not in any way relieve the Government of its burden to show that these Defendants had knowledge of the essential objectives of the conspiracy - to possess with the intent to distribute large quantities of cocaine.

In addition to the discussion of the Defendants involved in Count One, the Government's submissions detail additional activities of the named and unindicted coconspirators identified in Count Two. Interviews with Clemente De Los Santos-Alvarez establish that he operated drug distribution/stash houses for the DTO in Atlanta, Georgia. Clemente De Los Santos-Alvarez stated he was interviewed and hired personally by Samuel Orozco to count and package United States currency and unload, store and

distribute cocaine from the Atlanta stash houses.  Clemente De Los Santos-Alvarez also directed his girlfriend, Glorivee Gonzalez, in her transportation of bulk U.S. currency on behalf of the DTO.

With respect to Ana Orozco, the Government's evidence indicates that Clemente De Los Santos-Alvarez allegedly said that Ana Orozco was present with her children when Samuel Orozco interviewed him to operate stash houses in Atlanta.  *Id.* at p. 8.  Juvenal Ramirez-Birrueta stated that Ana Orozco signed paperwork to buy a Land Rover.  *Id.* at p. 18, ¶L.  Timothy Schmitz, an unwitting landlord for a stash house in Georgia, indicated that Ana Orozco wrote a check for the initial payment on a rental home in Smyrna, Georgia.  *Id.* at p. 21, ¶¶A, B.

The Government also described an interview with Benerito Marquez who described his role as a driver in the DTO.  Benerito Marquez described how Samuel Orozco asked him to purchase a Land Rover Discovery to transport multiple loads of cocaine from Juarez, Mexico to Denver, Colorado and Atlanta, Georgia.  Samuel Orozco also asked Benerito Marquez's common-law wife to purchase a 2004 Land Rover.  Samuel Orozco funded the purchase of this vehicle.  At the direction of Samuel Orozco, Benerito Marquez used that vehicle to deliver cocaine to Clemente De Los Santos-Alvarez in Atlanta, Georgia.

The interview with Glorivee Gonzalez also implicated Alejandro De Los Santos-Ortiz in the drug conspiracy.  *See* Government's Chart, p. 10, ¶¶E-F.  Glorivee Gonzalez purchased a Land Rover and drove the vehicle to Houston, Texas.  When the vehicle was returned to Glorivee Gonzalez it was loaded with cocaine and she was instructed to deliver the cocaine loaded SUV to Alejandro De Los Santos-Ortiz.  Apparently, Glorivee Gonzalez did in fact turn the car over to Alejandro De Los Santos-Ortiz.  Tr. of Sept. 25, 2009, p. 59.

Consistent with the foregoing, I find that the Government has shown that a

conspiracy to possess and distribute large amounts of cocaine existed and that Defendants Samuel Orozco, Juvenal Ramirez-Birrueta, Ramon Mendoza-Sandoval, Clemente De Los Santos-Alvarez, Benerito Abel Marquez, Alejandro De Los Santos-Ortiz, Joseph Torrez, Gregory Montgomery and Daniel Valdez were members of the conspiracy alleged in Count Two of the superseding indictment. These Defendants mostly implicate themselves in the conspiracy to possess and distribute cocaine. The Government sufficiently demonstrated that these Defendants had knowledge of the nature and scope of the DTO and these Defendants "intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." *Evans*, 970 F.2d at 671.

Defendant Ana Nemia Orozco argues that the government failed to show how her actions connect her to the conspiracy. I agree. The Government's evidence places Ana Orozco at locations that might support a finding that she was connected to the distribution conspiracy. Ultimately, however, in my view the Government's evidence and arguments do little more than physically place Ana Orozco at locations where her husband Samuel Orozco is committing acts arguably in furtherance of the conspiracies. *United States v. Williamson*, 53 F.3d 1500, 1518-19 (10th Cir. 1995)("Mere association with coconspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy.") The Government's evidence and argument failed to flesh out her involvement or participation in the described events. The Government further failed to show that she accepted the conspiratorial objectives and knowingly and voluntarily joined the conspiracy to distribute cocaine. *Id.* As such, the Government has done nothing more than demonstrate that Ana Orozco associated with a conspirator, her husband, which is insufficient to bring Ana Orozco within the conspiracy alleged in Count Two of the superseding indictment. *Williamson*, 53 F.3d at 1519-20; *accord Ivy*, 83 F.3d at 1285.

("[M]ere association with conspirators known to be involved in crime" is insufficient.)

The Government has also failed to show that the remaining Defendants named in Count Two were members of the distribution conspiracy.[5]  With respect to Beatriz Munoz-Carrillo, the Government admitted at the hearing that she was not involved in possessing, distributing or transporting cocaine.  *See* unofficial Bridge transcript of Feb. 16, 2010 hearing at 14:21:48-14:22:46.  The Government further admitted that her involvement was limited to the money laundering conspiracy.  *Id.*  Defendants Luz Elena Rodriguez-Carrillo, Jose Martinez and Shane MacDonald were not even mentioned in the Government's Proffer or Chart, nor were they discussed during Special Agent Villasuso's testimony.  Jesus Dorantes-Feregrino is merely identified in one instance in the Government's summary as someone assisting in drug operations in Mexico.  *See* Govt.'s Mot., p. 3, ¶3 [d/e 1237].  Although Martha Orosco and Evaristo Orosco are briefly mentioned in the Government's Chart, the Government provided no evidence tying them to a conspiracy to possess and distribute cocaine or that they even knew the essential objectives of the conspiracy alleged in Count Two.  Finally, the Government admitted during the September 25, 2009 hearing that Defendant Tad Davis's involvement was limited to the money laundering conspiracy.  Tr. of Sept. 25, 2009, p. 64 [d/e 1552].  The Government therefore failed to connect these Defendants to the conspiracy alleged in Count Two.

Defendant Adrian Allan Romero's role in the conspiracy is set forth in one sentence in the Government's Chart.  *See* Government's Chart, p. 3, ¶A [d/e 1237-1].  The Government suggests that Joseph Torrez stated there were at least four or five checks written by Adrian Romero to purchase cocaine.  *Id.*  At the hearing, the Government

---

[5]I incorporate by reference my discussion and analysis of Rafael Ramirez-Birrueta, Beatriz Adriana Mercado-Macias and Armando Martinez-Anaya above concerning Count One in my discussion of for Count Two.

admitted it had no knowledge as to whether Adrian Allan Romero was dealing cocaine. Tr. of Sept. 25, 2009, p. 87 [d/e 1552]. Special Agent Villasuso stated that, "[Adrian Allan Romero] could do whatever he wanted with that cocaine. I was interested in the larger organization." *Id.* at lines 4-5. While the Government's evidence links Adrian Allan Romero to Joseph Torrez, the Government had no evidence Adrian Allan Romero interacted with any other Defendant in this case or that he even knew any other Defendant, including Samuel Orozco. *Id.* at p. 89; *see* also unofficial Bridge transcript of Feb. 16, 2010 hearing at 14:30:10-28. There is no evidence that Adrian Allen Romero knew about a conspiracy to distribute or possess cocaine or that he shared a goal with the members of the conspiracy. There is merely evidence that Adrian Allen Romero purchased cocaine, most likely for personal use, from Joseph Torrez. *Ivy*, 83 F.3d at 1285 ("the government must do more than show there were casual transactions between the defendant and the coconspirators known to be involved in the crime."). There is no evidence that Mr. Romero distributed any of the cocaine he purchased from Joseph Torrez. At best, the Government has shown the existence of a buyer-seller relationship between Adrian Allen Romero and Joseph Torrez. *Horn*, 946 F.2d at 741 ("[P]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy[.]"). Such a showing does not support a finding that Adrian Allen Romero was a member of the conspiracy alleged in Count Two. Accordingly, the Government failed to show that Adrian Allan Romero knowingly and voluntarily joined a conspiracy to distribute cocaine or that Adrian Allan Romero's activities were interdependent with that conspiracy.

### (iii). COUNT FOUR - MONEY LAUNDERING CONSPIRACY

Count Four alleges a money laundering conspiracy during the same time frame - April 14, 2000 to December 17, 2007. Count Four alleges that certain Defendants

conspired "to conduct and attempt to conduct financial transactions, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and which transactions, in fact, involved the proceeds of illegal drug trafficking as charged in Counts One, Two and Three . . . ." *See* Sup. Ind., p. 6 [d/e 249]. The named Defendants are Samuel Orozco, Juvenal Ramirez-Birrueta, Rafael Ramirez-Birrueta, Ramon Mendoza-Sandoval, Ana Nemecia Orozco, Beatriz Munoz-Carrillo, Luz Elena Rodriguez-Carrillo, Jose Martinez, Tad Davis, Shane MacDonald, Evaristo Orosco, Martha Orosco, Beatriz Adriana Mercado-Macias, Robert Clark, Juliana Monica Atencio and Cynthia Orosco. *Id.* at p. 8. The named unindicted coconspirators were Joseph Torrez and Greg Montgomery. *Id.*

Count Four includes 1,676 overt acts of money laundering. *See* Sup. Indict., pp. 9-78 [d/e 249]. The Government suggests that descriptions of these overt acts in Count Four of the superseding indictment establish that:

> the activities of the conspirators in support of the DTO were varied and extensive, ranging: from the purchase of and transfer of titles to drug load vehicles; the purchases of real properties with drug proceeds; the depositing of millions of dollars in currency in structured deposits into banks and other financial institutions under various names and entities in order to conceal the source of the currency and to prevent the banks from filing Currency Transaction Reports (CTRs) that would have alerted Federal law enforcement authorities to this activity; and the payment of "hush money" to arrested conspirators and another conspirator who attempted to blackmail key participants in the DTO.

Govt.'s Mot., p. 6, ¶9 [d/e 1237].

Coupled with the information contained in the Chart and the testimony of Agent Villasuso, the Government's superseding indictment contains enough detail for me to find as a provisional matter the existence of some type of money laundering conspiracy and to identify some of the Defendants who were members. *See* Sup. Indict. [d/e 249]. The chart

and superseding indictment describe Samuel Orozco's vehicle and real property purchases, deposits and withdrawals of substantial volumes of currency. The Government has further described Tad Davis and Robert Clark's participation in the organization. Samuel Orozco would provide Mr. Davis with gym bags containing $10,000 - $40,000 in cash. Mr. Davis would deposit the currency in his personal account and then provide checks drawn from this account whenever Samuel Orozco called and asked for money. Ronald Clark was the accountant for the DTO and prepared tax returns for Samuel Orozco and others. The chart also describes how Samuel Orozco attempted to pay "hush" money to Greg Montgomery after he had been arrested by law enforcement.

The superseding indictment also describes how Beatriz Adriana Mercado-Macias transferred more than $49,000 to an account in the name of Martha Orosco in 2006. (Sup. Indict, p. 76 [d/e 249]). There is also a description of wire transfers involving Mr. Davis, Samuel Orozco and Beatriz Adriana Mercado-Macias whereby Ms. Mercado-Macias ultimately received more than $60,000. (*Id.* at pp. 57-58). The indictment further describes the transfer of almost $10,000 between Shane McDonald and Samuel Orozco in March 2005. (*Id.* at p. 57).

The superseding indictment also describes structured deposits made by Ana Orozco (*Id.* at pp. 11-13, 21-23, 47), her involvement in purchasing and selling vehicles involved in the DTO (pp 59-60, 64-65) and real property (p. 66); Rafael Ramirez-Birrueta's involvement in the purchase of a Land Rover discovery (pp. 59-60); Tad Davis made structured deposits (pp. 33-35, 47 and 54-56); Evaristo and Martha Orosco made structured deposits (pp. 36, 53) and were involved in real property transactions (pp. 67 and 77).

Several Defendants correctly argue that the Government's Proffer and Chart make

no or very little mention of them in relationship to the money laundering conspiracy. The Defendants claim that the Government failed to meet its burden to show participation in the money laundering conspiracy. I agree. The Government failed to demonstrate that Beatriz Munoz-Carrillo, Luz Elena Rodriguez-Carrillo, Jose Martinez, Juliana Monica Atencio and Cynthia Orosco were members of the money laundering conspiracy. With respect to Luz Elena Rodriguez-Carrillo and Jose Martinez, the only mention of these Defendants in all of the materials before me is in the superseding indictment. The superseding indictment details their involvement in automobile purchases (pp. 64, 72 and 74) and structured deposits made by Jose Martinez (p. 30). The Government, however, made no effort to explain these Defendants involvement or provide any further information regarding their participation in a massive money laundering conspiracy. The Government seems to believe that describing other Defendants involvement in the conspiracy in detail and then listing similar transactions by Luz Elena Rodriguez-Carrillo and Jose Martinez is enough to show participation in the conspiracy. The Government is wrong. *See Evans,* 970 F.3d at 673 ("[I]t is ... essential to determine what kind of agreement or understanding existed as to each defendant.") This is exactly the type of guilt by association that the Tenth Circuit warns against in massive conspiracies.

> we must be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy. The risk is that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants. The government must not be allowed to use conspiracy as a tool to circumvent the fundamental principle that guilt with us remains individual and personal.... It is not a matter of mass application.

*Id.* at 674 (quotations omitted). Here, the record is devoid of any evidence to support an inference that Luz Elena Rodriguez-Carrillo and Jose Martinez were members of a money laundering conspiracy.

The same is true for Beatriz Munoz-Carrillo and Cynthia Orosco.  The Government provided some additional information for these Defendants beyond their brief mention in the superseding indictment (Sup. Indict, p. 37, 42, 53, 56, 73-74).  Ms. Orosco shows up in the Government's Chart in her role attempting to retrieve Samuel Orozco's computer from Dora Morales.  *See* Govt.'s Chart, pp. 22-23 [d/e 1237-1].  Beatriz Munoz-Carillo is also referred to in the Chart in her capacity as a contact person for Samuel Orozco, her involvement with one of Mr. Orozco's businesses, CLG, and her involvement in driving Samuel Orozco around in Mexico.  *Id.* at pp. 22, 24 and 26.  This information, however, does nothing more than demonstrate that Ms. Orosco and Ms. Munoz-Carrillo associated with criminals.  *Williamson*, 53 F.3d at 1518-19 ("Mere association with coconspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy.")  At most, the Government has demonstrated a casual connection between these defendants and other conspirators, which is insufficient to show participation in a conspiracy.  *Ivy*, 83 F.3d at 1285 ("the government must do more than show there were casual transactions between the defendant and the coconspirators known to be involved in the crime.")

The Government also failed to demonstrate that Juliana Monica Atencio was a member of the money laundering conspiracy.  Ms. Atencio's involvement primarily relates to her association with her ex-husband, the admitted coconspirator Joseph Torrez.  Ms. Atencio is listed on a joint account with Mr. Torrez that reflects structured deposits.  (Sup. Indict, pp.49-51).  The Government's Chart also details Mr. Torrez's statements that Ms. Atencio threatened to reveal his drug trafficking activities if he did not pay a certain amount of child support (*See* Govt.'s Chart, p. 3 [d/e 1237-1]) and her involvement in obtaining bail money for Mr. Torrez following his arrest.  I agree with the Defendant that this information

merely evidences her knowledge of some type of illegal activity by Mr. Torrez, not her voluntary agreement to participate in a conspiracy. *Williamson*, 53 F.3d at 1518-19 ("Mere association with coconspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy.")

The Government has made a sufficient showing that the remaining Defendants named in Count Four were members of the money laundering conspiracy. Sufficient information was presented by the Government to demonstrate these Defendants "intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged."[6] *Evans*, 970 F.2d at 671. Accordingly, I find that the Government has made a sufficient showing at this preliminary stage of the proceedings that Samuel Orozco, Juvenal Ramirez-Birrueta, Rafael Ramirez-Birrueta, Ramon Mendoza-Sandoval, Ana Nemecia Orozco, Tad Davis, Shane MacDonald, Evaristo Orosco, Martha Orosco, Beatriz Adriana Mercado-Macias, and Robert Clark were members of the money laundering conspiracy.

### (iv). SUMMARY OF MEMBERSHIP IN CONSPIRACIES

Based on the foregoing, the Government has failed to demonstrate that any Defendants presently before the Court[7] were members of the conspiracies alleged in Count One and Two.[8] Accordingly, none of the coconspirator statements relating to those

---

[6]The Government's summary incorporates by reference the superseding indictment. The superseding indictment does contain information connecting these Defendants to the money laundering conspiracy. Relying on the information contained in the superseding indictment is consistent with my directives from the hearings as well as with the wide latitude afforded trial judges by existing law. Moreover, because I am only making this ruling as a provisional matter it still remains the Government's burden to make a proper showing of membership in the conspiracy at trial through admissible evidence.

[7]The Defendants presently before the Court are Rafael Ramirez-Birrueta, Ana Nemecia Orozco, Beatriz Muñoz-Carrillo, Luz Elena Rodriguez-Carillo, Jose Martinez, Tad Asa Davis, Adrian Allen Romero, Evaristo Orosco, Martha Orosco, Juliana Atencio, and Cynthia Orosco.

[8]Excludes fugitives (Samuel Orozco, Ramon Mendoza-Sandoval, Sebastian De Los Santos-Hernandez, Beatriz Adriana Mercado-Macias, Alejandro De Los Santos-Ortiz and Jesus Dorantes-Feregrino), unindicted coconspirators (Joseph Torrez, III, Gregory Montgomery and Daniel Valdez) and Defendants with cases already closed (Juvenal Ramirez-Birrueta, Armando Martinez-Anaya, Clemente De Los Santos-Alvarez, Shane MacDonald

conspiracies is admissible against any of these Defendants. *Hall*, 473 F.3d at 1302-03. (In order for statements to be admissible under Rule 801(d)(2)(E) the declarant and the defendant must both be members of the conspiracy). The Government, however, has made the requisite showing that Rafael Ramirez-Birrueta, Ana Nemecia Orozco, Tad Davis, Evaristo Orosco and Martha Orosco were members of the money laundering conspiracy set forth in Count Four.

### B. STATEMENTS MADE DURING THE COURSE AND IN FURTHERANCE OF CONSPIRACY

The remaining element to be proven by the Government is that the proffered statements were made during the course and in furtherance of the conspiracy. Statements made during the course of a conspiracy must have been "made before the conspiracy's objectives had either failed or been achieved . . . ." *United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997). This requirement is to be strictly construed. *United States v. Perez*, 989 F.2d 1574, 1579 (10th Cir. 1993). However, only the declarant must be a member of the conspiracy - it does not matter that the statement was made to someone outside the conspiracy. *Willamson*, 53 F.3d at 1519. Furthermore, "previous statements made by co-conspirators are admissible against a defendant who subsequently joins the conspiracy." *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991).

"Statements by a conspirator are in furtherance of the conspiracy when they are intended to promote the conspiratorial objectives." *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (internal quotation marks omitted). Similar to the "during the course" requirement, "the 'in furtherance' requirement of 801(d)(2)(E) was intended to be a significant obstacle for the government; it is to be strictly construed and narrowly applied." *Rascon*, 8 F.3d at 1540. The Tenth Circuit has held:

---

and Benerito Abel Marquez).

When inquiring whether a statement was made in furtherance of a conspiracy, we do not focus on its actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement. No talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy. To the contrary, this determination must be made by examining the context in which the challenged statement was made.

*Perez*, 989 F.2d at 1578-79 (citations and internal quotation marks omitted).

In providing further guidance through examples, the Tenth Circuit has held that "statements are not in furtherance of a conspiracy if they are mere narratives, that is statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." *Id.* at 1578. Statements that are in furtherance of a conspiracy include:

statements that explain events of importance to the conspiracy in order to facilitate its operation, statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy, and statements of a coconspirator identifying a fellow coconspirator.

*Townley*, 472 F.3d at 1273 (citations, internal quotation marks, and alterations omitted). In addition, statements discussing the particular roles of other coconspirators, statements made to avoid detection by law enforcement officials, statements designed to allay fears and suspicions, and statements attempting to induce future involvement are in furtherance of the conspiracy. *Williamson*, 53 F.3d at 1519-20; *see also Perez*, 989 F.2d at 1578. Statements concerning what can be reasonably be inferred to be drug transactions are also in furtherance of the conspiracy. *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993).

Before I can analyze whether the Government has satisfied its final showing for introducing coconspirator statements, whether a statement was during the course of and

in furtherance of a particular conspiracy, I must first determine what statements the Government seeks to introduce under Rule 801(d)(2)(E). As discussed in great detail above, the Government repeatedly failed to submit a proper *James* proffer that included a Chart identifying the exact statements the Government seeks to introduce pursuant to Rule 801(d)(2)(E). Although the Government's June 5, 2009 Proffer and Chart were still deficient, I declined to strike the Government's submission and allowed the Government to elaborate on the information in its submissions at the hearings before me in September and February. Specifically, I instructed the Government to identify the specific statements in the Chart it seeks to admit and identify the conspiracy (Count One, Two or Four) the Government believed related to the conversations. Tr. of Sept. 25, 2009, p. 19 [d/e 1552]. Accordingly, I will limit my review of the Government's Chart to the sections identified at the hearing as including statements made in furtherance of the money laundering conspiracy - Count Four. My analysis of whether that section of the Chart contains "statements" made during the course of and in furtherance of the money laundering conspiracy immediately follows each section of the Government's Chart.

**(i.) Govt.'s Chart, p. 2, ¶A; identified by the Government as pertaining to Count Four.** *See* **Tr. of Sept. 25, 2009, p. 24-25.**

TORREZ stated that OROZCO provided him with bulk currency and instructed TORREZ on how to deposit those funds into the banking system in order to avoid suspicion or detection by law enforcement.

This is merely a summary of a statement made by Samuel Orozco to Joseph Torrez. While it appears that the statement summarized here would be in furtherance of a conspiracy to launder money, the Governments failure to provide the specific statement it seeks to admit prevents me from finding the statement admissible pursuant to Rule 801(d)(2)(E). Joseph Torrez's statements, of course, are not hearsay. *Townley,* 472 F.3d

at 1273 ("direct testimony of a conspirator ... describing his participation in the conspiracy and the actions of other is not hearsay.")(quotations omitted).

### (ii.) Govt.'s Chart, p. 3, ¶A; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 29.

> Following OROZCO's instructions, TORREZ endorsed checks over to OROZCO that were originally made payable to TORREZ by other individuals for drug purchases. (TORREZ said there were at least four to five checks written by Adrian ROMERO for drug purchases which were made payable to TORREZ which he, in turn, endorsed over to OROZCO.)

The potential coconspirator statements (by the declarant Samuel Orozco) referenced in this paragraph were summarized in one word - "instructions." Thus, the Government failed to provide sufficient detail or specificity for me to rule on the admissibility of the statements summarized in this manner. Torrez's statements about what he observed involving Romero are not hearsay. *Townley,* 472 F.3d at 1273 ("direct testimony of a conspirator ... describing his participation in the conspiracy and the actions of other is not hearsay.")(quotations omitted).

### (iii.) Govt.'s Chart, p. 3, ¶B; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 29.

> OROZCO told TORREZ that his intent was to create the appearance that the monies (checks) were for some sort of legitimate work, disguising the true illegal nature of the payments. *Id.*

I have previously determined that the declarant of this statement, Samuel Orozco, was a member of the conspiracy alleged in count four. The Government demonstrated at the hearing that the conversation between Samuel Orozco and Joseph Torrez occurred after 2002, but before 2007. *See* Tr. of Sept. 25, 2009, p. 30. The statement was also in furtherance of the conspiracy as it explains how the money laundering conspiracy operated. Therefore the statement is provisionally admitted pursuant to Rule 801(d)(2)(E).

**(iv.)  Govt.'s Chart, p. 4, ¶C; identified by the Government as pertaining to Count Four.  *See* Tr. of Sept. 25, 2009, p. 40.**

MONTGOMERY stated that several months after his arrest, OROZCO contacted him over the telephone (not recorded) and said that he had left a pre-paid cellular telephone at the customer service desk at the Cherry Creek Mall and instructed MONTGOMERY to pick up this telephone. MONTGOMERY said OROZCO insisted that only this telephone was to be used to maintain contact with OROZCO. MONTGOMERY said OROZCO stated that "he had been down this road with other people before" and that MONTGOMERY "would only do a few years." OROZCO also asked MONTGOMERY about his intentions in terms of cooperating with the Government, stating that his people in Mexico wanted to know his intentions and "there is no reason for two people to go to jail."

Although the declarant here, Samuel Orozco, was a member of the conspiracy, this statement was not made in furtherance of the conspiracy.  This statement amounts to nothing more than a narrative regarding past events ("down this road before") and inquires about Gregory Montgomery's intentions.  A statement inquiring about Montgomery's intentions, without more, serves no immediate or future conspiratorial purpose.  Therefore these statements are not admissible pursuant to Rule 801(d)(2)(E).  *Rascon*, 8 F.3d at 1540 ("the 'in furtherance' requirement of 801(d)(2)(E) was intended to be a significant obstacle for the government; it is to be strictly construed and narrowly applied.").

**(v.)  Govt.'s Chart, p. 5, ¶A; identified by the Government as pertaining to Count Four.  *See* Tr. of Sept. 25, 2009, p. 42.**

MONTGOMERY contacted OROZCO on April 10, 2007 (This conversation was recorded.). OROZCO stated that he believed that TORREZ had debriefed or been interviewed by law enforcement and OROZCO told him that he was concerned about MONTGOMERY also cooperating with law enforcement. OROZCO stated to MONTGOMERY that he would be financially taken care of, by OROZCO if MONTGOMERY did not implicate OROZCO or others in his (drug trafficking) organization.

The declarant, Samuel Orozco, was a coconspirator, and the statement was made during the course of the conspiracy, April 10, 2007.  Moreover, the statement was in

furtherance of the conspiracy because of Samuel Orozco's intent in making the statement

to Gregory Montgomery. *Perez*, 989 F.2d at 1578-79 (when inquiring whether a statement

was made in furtherance of a conspiracy, we do not focus on its actual effect in advancing

the goals of the conspiracy, but on the declarant's intent in making the statement).  Samuel

Orozco intended to provide reassurance and maintain trust (*Townley*, 472 F.3d at 1273)

as well as to conceal the identities of the members of the conspiracy.   Samuel Orzco's

statement - that he was concerned Montgomery was cooperating with law enforcement and

that Montgomery would be financially taken care of by Orozco if Montgomery did not

implicate Orozco or others in the DTO - is provisionally admitted as a coconspirator

statement pursuant to Rule 801(d)(2)(E).

### (vi.) Govt.'s Chart, p. 5, ¶B; identified by the Government as pertaining to Count Four.  *See* Tr. of Sept. 25, 2009, p. 42.

OROZCO stated that MONTGOMERY should not trust his attorney because they (MONTGOMERY' and TORREZ' attorneys) were young and only wanted to get their names in the newspapers because this would be a big case.   OROZCO stated that their (OROZCO's and MONTGOMERY's) telephones were secure to communicate, but he did not want to risk the mention of any names. OROZCO stated that "as long as he (OROZCO)… his (MONTGOMERY's) boss was scot free, then "the boss" (OROZCO referring to himself in the third person) would be there for him." OROZCO stated that he would take care of MONTGOMERY and that "he would know who talked and what was said because he would have a copy of everything because he had sources."

For the same reasons discussed with respect to the previous statements, the

statement attributable to Samuel Orozco starting at "as long as" through the end of the

paragraph is also provisionally admitted pursuant to Rule 801(d)(2)(E).

### (vii.) Govt.'s Chart, p. 5, ¶C; identified by the Government as pertaining to Count Four.  *See* Tr. of Sept. 25, 2009, p. 43.

(MONTGOMERY said that shortly after April 10, 2007 he received a

telephone call (not recorded) from a 520-000-0000 number which displayed on his caller ID. MONTGOMERY believes that this call was from an individual he knew as "Sebastian" (DE LOS SANTOS-ALVAREZ) because DE LOS SANTOS HERNANDEZ spoke very little English and appeared to be reading a statement.) DE LOS SANTOS HERNANDEZ said," If you will own up to this charge, we will provide for your family. Otherwise, we'll take care of your family." (MONTGOMERY construed this to be a threat against his family if he elected to cooperate with the Government.)

Because the Government failed to demonstrate, or even allege, that the declarant here, Sebastian de Los Santos-Alvarez[9], was a member of the conspiracy alleged in count four, his statements are not admissible pursuant to Rule 801(d)(2)(E). No other statements are set forth in this section of the Chart.

### (viii.) Govt.'s Chart, p. 5, ¶D; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 44.

MONTGOMERY said he was also instructed by OROZCO to write a letter to Judge Nottingham, admitting full responsibility for the drugs found in the vehicle and absolving TORREZ of any involvement. MONTGOMERY stated that OROZCO also told him that if he completed his jail time, MONTGOMERY's ex-spouse, his companion and child support would be taken care of during his incarceration.

The declarant, Samuel Orozco, was a coconspirator, and the Government indicated at the hearing that this statement was made after January 2007, but before May 2007. *See* Tr. of Sept. 25, 2009, p. 44. The statement is also in furtherance of the conspiracy as Samuel Orozco's intent in making the statement was to minimize damage to the conspiracy and to provide reassurance and maintain trust and cohesiveness among the coconspirators (*Townley*, 472 F.3d at 1273). Thus, it is provisionally admitted pursuant to Rule 801(d)(2)(E).

---

[9]The Government indicated at the hearing that the declarant was actually Sebastian de los Santos-Hernandez not Sebastian de los Santos-Alvarez. The Government did not argue that Alvarez or Hernandez were members of the money laundering conspiracy.

**(ix.) Govt.'s Chart, p. 6, ¶A; identified by the Government as pertaining to Count Four.** *See* **Tr. of Sept. 25, 2009, p. 49.**

(MONTGOMERY said that OROZCO again called him on May 29, 2007.) OROZCO said he would "leave enough for the next two months" and it would be "four contracts or papers" ($4,000 in "hush" money) because he would be out of town. OROZCO also asked if any names had come up because he "had heard through the grapevine that 'the boss' name had come up." OROZCO said "he had to retire from his employment and had to sell everything so he was not doing okay." OROZCO stated "he was making one third of what he had made and that he was still paying you (MONTGOMERY)." OROZCO added that he was "just like you (MONTGOMERY) doing what he had been doing for years at the other company."

The statement relating to the payment of hush money was made by a coconspirator, Samuel Orozco, and during the course of the conspiracy, May 29, 2007. The statement was also in furtherance of the conspiracy as it was made to maintain trust (*Townley*, 472 F.3d at 1273) and to conceal the identities of the members of the conspiracy. The remainder of this section, from the discussions about "the boss" name coming up through the hardships he's currently experiencing, are not statements in furtherance of the money laundering conspiracy. The Government has made no showing that these statements furthered any conspiratorial objective. To the extent these statements could be characterized as updating Mr. Montgomery of the status of the conspiracy (*Townley*, 472 F.3d at 1273), the statements would most likely relate to the conspiracy to import and/or distribute cocaine, not the money laundering conspiracy. Accordingly, and because the "in furtherance" requirement is to be strictly construed, the remainder of this section of the Chart is not admissible as a coconspirator statement. *Rascon*, 8 F.3d at 1540 ("the 'in furtherance' requirement of 801(d)(2)(E) was intended to be a significant obstacle for the government; it is to be strictly construed and narrowly

applied.").

**(x.)** **Govt.'s Chart, p. 7, ¶A; identified by the Government as pertaining to Count Four.** *See* **Tr. of Sept. 25, 2009, p. 51.**

MARQUEZ stated that OROZCO asked him to purchase a 2002 Land Rover Discovery and that MARQUEZ had the vehicle titled in the name of Ezequiel MARQUEZ, an alias used by Benerito MARQUEZ.

The potential coconspirator statements (by the declarant Samuel Orozco) referenced in this paragraph were summarized in one word - "asked." Thus, the Government failed to provide sufficient detail or specificity for me to rule on the admissibility of the statements summarized in this manner. The remainder of the section describes actions performed by Benerito Marquez and are not "statements".

**(xi.)** **Govt.'s Chart, p. 11, ¶A; identified by the Government as pertaining to Count Four.** *See* **Tr. of Sept. 25, 2009, p. 64.**

OROZCO told DAVIS that he owned several businesses in Mexico, to include a gold mine, a lumber company, and a mango plantation and OROZCO claimed that he wanted to sell some of those businesses and focus on getting back to Colorado.

The Government failed to demonstrate when this conversation between Samuel Orozco and Tad Davis occurred. The Chart indicates they originally met in 1999 and "subsequently met" to discuss Orozco's insurance needs. Agent Villasuso's testimony merely provides that Mr. Davis "became involved with Mr. Orozco in approximately June of 2000." *See* Tr. of Sept. 25, 2009, p. 64. These vague references by the Government to various dates are insufficient for the purposes of my analysis. The Government's Chart, however, clearly indicates the date Mr. Davis relayed the substance of this conversation to the Government - April 8, 2008. Because Mr. Davis is not the declarant of the statement, the date Mr. Davis informed the Government of the statement is completely irrelevant to

my analysis of whether the statement occurred during the course of the alleged conspiracy. *Sinclair*, 109 F.3d at 1534 (statements made during the course of a conspiracy must have been "made before the conspiracy's objectives had either failed or been achieved . . . ."). Without this significant detail, I cannot determine whether this statement was made during the course of the money laundering conspiracy. *Perez*, 989 F.2d at 1579 (the requirement that a statement be made during the course of a conspiracy is to be strictly construed). Accordingly, no basis exists for me to admit the statement pursuant to Rule 801(d)(2)(e).

**(xii.) Govt.'s Chart, p. 11, ¶B; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 64.**

During June of 2000, Samuel OROZCO told DAVIS that he wanted to start an umbrella company, SAMUEL ENTERPRISES, in Colorado in order to move his business operations to the United States and he requested DAVIS to establish SAMUEL ENTERPRISES LLC and HISTORICAL DEVELOPMENT LLC. DAVIS agreed to do this and, as directed by OROZCO, he identified the listed office and manager addresses for these businesses as 740 South Harrison Street, Denver, Colorado. OROZCO told DAVIS that SAMUEL ENTERPRISES was set up to operate some of the following businesses: a bar, real estate investments, Latino concerts, and a skate shoe distributorship.

Samuel Orozco was a member of the conspiracy and the statements occurred in June of 2000, which was during the money laundering conspiracy. The statements are also in furtherance of the conspiracy because they describe Tad Davis's role in the conspiracy and identify the manner in which Samuel Orozco will conceal his illegal activities through various corporations. Therefore, the statements where Samuel Orozco tells Davis what he wants to start and why Samuel Enterprises was established are both provisionally admitted as coconspirator statements pursuant to Rule 801(d)(2)(E). The remaining information in this section of the Chart is not a statement, but a description of Tad Davis's actions, and therefore not admissible as a coconspirator statement.

**(xiii.) Govt.'s Chart, p. 11, ¶C; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 64.**

OROZCO invited DAVIS to this residence where DAVIS initially received a gym bag containing $10,000 in $20 denominations from Samuel OROZCO, with OROZCO instructing DAVIS to deposit the currency in increments of $2,500 into DAVIS' personal account. DAVIS stated that on subsequent occasions, OROZCO contacted him and asked DAVIS to come to his residence in Centennial where OROZCO gave him several more $10,000 dollar increments to deposit. (This eventually increased to $40,000 increments.)

The only information here that could be described as a statement is the reference to Samuel Orozco "instructing" Mr. Davis to perform an act and "asking" Mr. Davis to come to Orozco's home. Coupled with the Government's failure to identify the date these statements occurred, the failure to expressly set forth the "instructions" and questions articulated by Samuel Orozco leaves me with no statements to analyze for admissibility purposes.

**(xiv.) Govt.'s Chart, p. 11, ¶D; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 64.**

As directed by OROZCO, DAVIS deposited the currency into his personal bank account and then OROZCO called him whenever OROZCO wanted to get money out of his account. (DAVIS would then provide him with checks drawn on his account). OROZCO directed DAVIS on at least one occasion to write a $10,000 check made payable to Ana OROZCO from these funds.

Rather than including the statements by the Declarant, Samuel Orozco, the Government claims that Samuel Orozco "directed" Tad Davis to perform certain actions and then describes the actions performed by Tad Davis. Without the statements that comprise this "directive", I am unable perform the analysis necessary to make admissibility rulings under Rule 801(d)(2)(E).

### (xv.) Govt.'s Chart, p. 12, ¶E; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 64.

DAVIS stated that OROZCO called him whenever he had bulk currency to be picked up and DAVIS then met OROZCO at his residence at 5910 South Ogden Court where he would pick up the money. DAVIS stated that, again as instructed by OROZCO, he would count the money into increments of approximately $2,500 and then make the deposits into his (DAVIS') account.

The Government's Chart describes phone calls without setting forth the substance of Samuel Orozco's statements during those phone calls. The Chart also describes "instructions" from Samuel Orozco and the acts Tad Davis performed pursuant to those "instructions." The failure to provide the statements themselves that form the substance of these "instructions" and phone calls, prevents me from considering their admissibility pursuant to Rule 801(d)(2)(E). Accordingly, this information is not admissible as a coconspirator statement.

### (xvi.) Govt.'s Chart, p. 12, ¶F; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 64.

DAVIS stated that after discussions with OROZCO on this subject, DAVIS opened another personal bank account at Wells Fargo near his original bank so that he could make multiple $2,500 deposits into different bank accounts on the same day.

There are no statements set forth or described in this section of the Chart for me to analyze under Rule 801(d)(2)(E). A vague reference to "discussions" without more, is insufficient.

### (xvii.) Govt.'s Chart, p. 20, ¶A; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 71.

CLARK said that Samuel OROZCO would tell him how much he wished to report as taxes due and owing on his income tax returns and CLARK would then "work the numbers backward" to show that amount of corresponding income. These returns were false.

This section describes a statement by Samuel Orozco to Robert Clark where he identified an amount he wished to report on his income tax filings. Unlike previous sections of the Chart, the instructions to Mr. Clark are described in sufficient detail for me to evaluate them as statements under Rule 801(d)(2)(E). The statement was made by a coconspirator during the course of the conspiracy. The statement was also in furtherance of the conspiracy as it served to explain Mr. Davis's role in the conspiracy and to create documents to conceal the organizations criminal activity. The reference to "work the numbers backward" was made by Mr. Davis and is not hearsay. *Townley,* 472 F.3d at 1273 ("direct testimony of a conspirator ... describing his participation in the conspiracy and the actions of other is not hearsay.")(quotations omitted). Therefore, the statement is provisionally admitted pursuant to Rule 801(d)(2)(E).

### (xviii.) Govt.'s Chart, p. 20, ¶B; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 71.

At the request of Samuel OROZCO, CLARK said he also prepared and signed false income verification letters indicating that Samuel OROZCO and Evaristo OROSCO were both employed at Samuel Enterprises, LLC. (A shell or "sham" corporation established by OROZCO with the assistance of Tad Davis as set forth herein above) and that those letters were then used by them to obtain mortgage financing to purchase the real properties identified above on Clayton and Nucla Streets.

Rather than setting out the statements made by Samuel Orozco, the Government indicates that Samuel Orozco made a "request" to Ronald Clark, then describes certain acts performed by Ronald Clark. Without the statements or even a summary of those statements, there is nothing for me to analyze under Rule 801(d)(2)(E).

### (xix.) Govt.'s Chart, p. 22, ¶A; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 74.

During late May 2007, OROZCO called to inform [Dora Morales] that there had been an accident at his gold mine in Mexico where one of the engineers had been killed and the Mexican authorities arrested OROZCO. Morales attempted to call OROZCO back but was unsuccessful.

This section details a statement by a coconspirator, Samuel Orozco, during the course of the conspiracy, May 2007. The Government elaborated during the hearing that this statement was part of Samuel Orozco's cover story to his employee, Dora Morales, and was meant to help him avoid detection from law enforcement. *See* unofficial Bridge Transcript of Feb. 16, 2010 at 12:38:08-12:40:36. I find that this statement is in furtherance of the conspiracy as Samuel Orozco's intent in making it was to conceal his illegal activities, including money laundering. Thus, the statement attributed to Samuel Orozco - that he had been in an accident at his gold mine in Mexico where one of his workers had been killed and he had been arrested - is provisionally admitted as a coconspirator statement pursuant to Rule 801(d)(2)(E).

### (xx.) Govt.'s Chart, p. 22, ¶B; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 74.

(Morales said she then called Beatriz CARRILLO because OROZCO had mentioned that whenever he could not be reached, CARRILLO would be the person who could relay any messages to him.) Morales said that Samuel OROZCO, through Beatriz CARRILLO, requested that Ramona Anaya notarize several vehicle titles in order to have the vehicles re-titled in the name of Samuel OROZCO or Beatriz CARRILLO or both, and that this occurred on several occasions.

This section of the Chart identifies a statement made by Samuel Orozco to Beatriz Munoz-Carillo, who then made statements to Dora morales. Dora Morales ultimately conveyed these statements to the Government. Because these statements amount to double hearsay, it is necessary to determine if both statements meet the requirements of Rule 801(d)(2)(E) for admissibility. *See* FED. R. EVID. 805 ("Hearsay within hearsay is not

excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules").  Because Beatriz Carrillo is not a coconspirator, her statement would not be admissible pursuant to Rule 801(d)(2)(E). Accordingly, Samuel Orozco's statement requesting to have Ramona Anaya notarize several vehicle titles is not admissible pursuant to Rule 801(d)(2)(E.  *See* FED. R. EVID. 805; *see also United States v. Payne*, 437 F.3d 540, 547 (6th Cir. 2006).

### (xxi.) Govt.'s Chart, p. 22, ¶C; identified by the Government as pertaining to Count Four.  *See* Tr. of Sept. 25, 2009, p. 74.

During late 2007, OROZCO sent three e-mails to Morales and left two voicemails on her cellular telephone. Morales said that OROZCO was in the process of selling Colorado Lending Group (CLG) to Beatriz Quezada and he asked Morales to remove his computer from CLG. Morales said that OROZCO informed her that his sister (Cynthia OROSCO) would go by Morales' residence to pick up his computer. (Morales maintained possession of this computer before eventually turning this computer over to investigators assigned to this case.)

This section of the Chart summarizes various voicemails and e-mails made by Samuel Orozco.  Because the Government failed to specify when these e-mails were sent and voicemails were left, I cannot determine whether they occurred before or after December 17, 2007, the suggested ending date of the money laundering conspiracy.  Even assuming they were made during the course of the conspiracy, I am unable to conclude that these statements were in furtherance of the conspiracy.  It is unclear to me how a declaration that Samuel Orozco was selling Colorado Lending Group and asking to have his computer removed prior to the sale furthered the conspiratorial objectives.  Agent Villasuso indicated that the computer had been analyzed by law enforcement, but no information regarding the contents of the computer was submitted to the Court.  *See* unofficial Bridge Transcript of Feb. 16, 2010 at 12:08:34-12:09:38.  Therefore, I have

insufficient information to conclude that these statements were made in furtherance of the money laundering conspiracy. *Rascon*, 8 F.3d at 1540("the 'in furtherance' requirement of 801(d)(2)(E) was intended to be a significant obstacle for the government; it is to be strictly construed and narrowly applied.")

### (xxii.) Govt.'s Chart, p. 22, ¶D; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 74.

Morales stated that during late December 2007, she received a call from Samuel OROZCO who claimed that all of the charges against him were not true and that all of the problems had been caused by Joseph TORREZ because TORREZ owed him money. Morales added that OROZCO also mentioned that he would need the computer for his defense. Morales informed OROZCO that she did not have the computer at her house. Morales also inquired whether OROZCO would pay the salary owed to her. Morales said OROZCO mentioned that he could only give her $2,000 to $3,000.

The superseding indictment provides that the money laundering conspiracy ended on December 17, 2007. Because the Government indicates the statements attributable to Samuel Orozco in this section of the Chart were made "during late December 2007", there is no basis for me to conclude these statements were made during the course of the money laundering conspiracy. *Perez*, 989 F.2d at 1579 (the requirement that a statement be made during the course of a conspiracy is to be strictly construed).

### (xxiii.) Govt.'s Chart, p. 23, ¶F; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 74.

Morales asked them if they knew what was going on with all of the arrests. Morales said that Oscar stated that Sam (OROZCO) was a small fry and that they (referring to DEA) did not have the time or manpower to go after Sam (OROZCO). Oscar then inquired if Morales had the computer. Morales told Oscar that she did not have the computer in her house. Oscar said that he (Sam OROZCO) would need it for his defense. Oscar told Morales that he would be in town for several days and requested that Morales call so that he could obtain the computer. Oscar also told Morales that although Sam (OROZCO) had given him short notice, he could give Morales $1,000. Oscar told Morales that there would be more money coming to Morales and added

that he hoped that Sam (OROZCO) would pay him back. Morales stated that after several days, Oscar called again to request the computer. Morales again stated she did not have the computer.

The Government has made no showing that the declarant, Oscar Orosco, was a member of the conspiracy alleged in count four. *Willamson*, 53 F.3d at 1519 (the declarant must be a member of the conspiracy for a statement to be admissible pursuant to Rule 801(d)(2)(E)).

### (xxiv.) Govt.'s Chart, p. 23, ¶G; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 74.

Morales stated that shortly after the arrests in October 2007, Cynthia OROSCO called on behalf of Samuel OROZCO to inform Morales not to travel to Mexico. Morales stated that she and Samuel OROZCO had previously agreed to meet in El Paso, Texas to talk about CLG, as well as about his wife, Ana OROZCO.

I am unable to discern any basis to conclude that Samuel Orozco's statement that Morales should not to travel to Mexico was in furtherance of the conspiracy. The Government's witness, Agent Villasuso, was similarly unable to articulate any reason why this statement was in furtherance of a money laundering conspiracy. *See* unofficial Bridge Transcript of Feb 16, 2010 at 12:06:20-12:06:46. The remainder of this section of the Chart is nothing more than mere narrative that served no immediate or future conspiratorial purpose. No portion of this section of the Chart is admissible pursuant to Rule 801(d)(2)(E).

### (xxv.) Govt.'s Chart, p. 23, ¶H; identified by the Government as pertaining to Count Four. *See* Tr. of Sept. 25, 2009, p. 74.

During June and August, 2007, Morales, as directed by Samuel OROZCO, said she went the home of Samuel OROZCO's parents at 11358 Nucla Street, Commerce City, on at least two occasions and met with Martha OROSCO who gave her a check for $2,200 in June and another for $5,000 in August, for salary owed to her by CLG. Morales said that OROZCO

informed her that the payments would come from his funds but the checks would be drawn on an account in his mother's name.

The first part of this section of the Chart does not contain any statements, only actions performed by Dora Morales at Samuel Orozco's direction. The last sentence, however, does contain a statement described with sufficient particularity to analyze. Orozco told Morales that her CLG salary would be paid from his personal funds drawn from a checking account in Martha Orosco's name. The statement was made by a coconspirator during the conspiracy (Samuel Orozco and June-August 2007). The statement was also in furtherance of the conspiracy as it describes the actual laundering of money by the head of the DTO, Samuel Orozco. This statement is therefore provisionally admitted pursuant to Rule 801(d)(2)(E).

## IV. CONCLUSION

Accordingly, it is

ORDERED that the Government has failed to demonstrate that Defendants Rafael Ramirez-Birrueta, Ana Nemecia Orozco, Beatriz Muñoz-Carrillo, Luz Elena Rodriguez-Carillo, Jose Martinez, Tad Asa Davis, Adrian Allen Romero, Evaristo Orosco, Martha Orosco, Juliana Atencio, or Cynthia Orosco were members of the drug importation and distribution conspiracies alleged in Count One and Two of the superseding indictment. The Government has, however, made a preliminary showing that Defendants Rafael Ramirez-Birrueta, Ana Nemecia Orozco, Tad Davis, Evaristo Orosco and Martha Orosco were members of the money laundering conspiracy set forth in Count Four. Accordingly, only those statements which are provisionally admitted as coconspirator statements against these defendants appear to meet the requirements of Rule 801(d)(2)(E). No other

statements are admissible as coconspirator statements. If the Government fails to establish the existence of foundational facts at trial, the Defendants may move for appropriate sanctions including mistrial.

Dated: June 15, 2010

BY THE COURT:

s/ Wiley Y. Daniel
WILEY Y. DANIEL,
CHIEF UNITED STATES DISTRICT JUDGE